**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **JAMES JACK, JR.,** | **CASE NO. 1:17-CV-0520 AWI SAB** |
| **Plaintiff** | |
| v. | **ORDER ON DEFENDANTS' MOTION TO DISMISS** |
| **COUNTY OF STANISLAUS, et al.,** | |
| **Defendants** | (Doc. No. 11) |

     This case stems from a violent confrontation between Plaintiff James Jack, Jr. ("Jack") and a fellow detainee at the Stanislaus County Jail. Jack brings claims against Stanislaus County ("the County") and members of the Stanislaus County Sheriff's Department, including Sheriff Adam Christianson, for violations California Government Code § 845.6 and the Fourteenth Amendment through 42 U.S.C. § 1983. Currently before the Court is Defendants' motion to dismiss the entirety of the Complaint. For the reasons that follow, the motion will be granted in part and denied in part.

**<u>RULE 12(b)(6) FRAMEWORK</u>**

     Under Federal Rule of Civil Procedure 12(b)(6), a claim may be dismissed because of the plaintiff's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A dismissal under Rule 12(b)(6) may be based on the lack of a cognizable legal theory or on the absence of sufficient facts alleged under a cognizable legal theory. See <u>Mollett v. Netflix, Inc.</u>, 795 F.3d 1062, 1065 (9th Cir. 2015). In reviewing a complaint under Rule 12(b)(6), all well-pleaded allegations of material fact are taken as true and construed in the light most favorable to the non-moving party. <u>Faulkner v. ADT Sec. Servs.</u>, 706 F.3d 1017, 1019 (9th Cir. 2013).

However, complaints that offer no more than "labels and conclusions" or "a formulaic recitation of the elements of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Johnson v. Federal Home Loan Mortg. Corp., 793 F.3d 1005, 1008 (9th Cir. 2015). The Court is "not required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." Seven Arts Filmed Entm't, Ltd. v. Content Media Corp. PLC, 733 F.3d 1251, 1254 (9th Cir. 2013). To avoid a Rule 12(b)(6) dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678; Mollett, 795 F.3d at 1065. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678; Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013). "Plausibility" means "more than a sheer possibility," but less than a probability, and facts that are "merely consistent" with liability fall short of "plausibility." Iqbal, 556 U.S. at 678; Somers, 729 F.3d at 960. The Ninth Circuit has distilled the following principles for Rule 12(b)(6) motions: (1) to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively; (2) the factual allegations that are taken as true must plausibly suggest entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation. Levitt v. Yelp! Inc., 765 F.3d 1123, 1135 (9th Cir. 2014). In assessing a motion to dismiss, courts may consider documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice. In re NVIDIA Corp. Sec. Litig., 768 F.3d 1046, 1051 (9th Cir. 2014). If a motion to dismiss is granted, "[the] district court should grant leave to amend even if no request to amend the pleading was made . . . ." Henry A. v. Willden, 678 F.3d 991, 1005 (9th Cir. 2012). However, leave to amend need not be granted if amendment would be futile or the plaintiff has failed to cure deficiencies despite repeated opportunities. Garmon v. County of L.A., 828 F.3d 837, 842 (9th Cir. 2016).

## **FACTUAL BACKGROUND**

From the Complaint, on March 7, 2016, a little after 1:00 a.m., Jack was arrested on an outstanding warrant by police officers from the City of Ceres and taken to the Stanislaus County Jail ("the Jail"). The Ceres police officers transferred custody of Jack over to County Sheriff's deputies. Approximately 10 hours later, Jack was taken to the emergency room of Doctor's Medical Center in Modesto after Jack was found to be behaving erratically. Jack was diagnosed with a fractured skull and traumatic brain injuries. Jack has been classified as incompetent by the Stanislaus County Superior Court due to his brain injuries, and he has no memory of the attack that caused his injuries.

Jack filed a request under the California Public Records Act with the County for documents relating to his injuries. The County refused to release any documents because each document was related to an active criminal investigation, even though many months had passed since Jack's injury and no charges against anyone had been filed. Jack petitioned the Stanislaus County Superior Court to order the release of the documents. After reviewing the documents *in camera*, the Superior Court concluded that the County had made false claims about the nature of the documents and about the existence of a criminal investigation and ordered the documents released. The documents that were released did not include video records of the jail. The documents released by the County allegedly indicate deliberate indifference and violations of California regulations.[1]

When Jack arrived at the Jail, he was placed into a group housing unit along without 40 other prisoners of various races. Jack was placed in the group housing unit after a cursory and inadequate housing evaluation and classification, or none at all. Jack had never been in a jail. Jack alleges that placing him in group housing with 40 other prisoners and in the middle of the night left him in great danger of conflict with and injury from one of the 40 prisoners, and thus demonstrates deliberate indifference. Jack further alleges that exposing him to prisoners of other races was deliberately indifferent to his rights because it is common knowledge among custodial

---

[1] The documents also indicate that no investigation into Jack's injuries occurred until May 2017, when the County received an inquiry from the FBI regarding how Jack received his injuries.

staff that racial tensions between prisoners often lead to altercations. Jack also alleges that Defendant Deputy Pearson (and others) were deliberately indifferent to his constitutional rights when they failed to place him in an administrative segregation cell, despite the fact that Jack had never been in jail before, did not know how to behave in jail, and was acting in a combative manner that was likely to cause conflict and physical altercations with other prisoners.

Pearson did not provide Jack with a mattress, despite contrary state regulations. Jack attempted to secure a mattress in the group housing unit around 3:30 a.m. In the process, he got into an argument with another prisoner who was identified as a 300 lbs. African American male. Jack weighed 170 lbs. Pearson heard Jack arguing with the other prisoner. After speaking with Jack and the other prisoner, Pearson walked away to a different part of the jail and did nothing to ensure that Jack would not be injured by the much larger prisoner. Immediately after Pearson walked away, Jack was struck in the head, lifted in the air, and thrown to the floor by the larger prisoner. Jack remained on the floor unconscious for several minutes. Pearson claims that he did not hear any indication that a physical altercation occurred. Pearson either left the relevant area of the jail unattended in violation of state regulation, or ignored the physical altercation. Jack was bleeding and the blood was visible on his face.

Jack alleges that Pearson and Defendant Deputy Gunsolley failed to properly perform mandatory hourly safety checks on Jack for at least 8 hours. Jack received no treatment for his brain injury during that time. Gunsolley claims that he sought medical help for Jack around 6:30 a.m. following an armband check. When presented with a written report that stated the incident time was 11:00 a.m., Gunsolley explained that he brought Jack for medical treatment several hours before the report was written and that Jack had spent several hours with medical staff. However, other documents indicate that Gunsolley did not seek medical attention for Jack until 11:00 a.m., which was 5 hours after his shift began.

At 11:15 a.m., Jack was seen by a Jail nurse. After being evaluated, Jack was sent to Doctor's Medical Center. Jack was diagnosed as suffering from a comminuted skull fracture with subarachnoid, subdural, and extradural hemorrhaging. In addition to the skull fracture, Jack had contusions on his ear, neck, shoulder, and back.

# DEFENDANTS' MOTION

## I.    Individual Capacity Claims

### *Defendants' Arguments*

Defendants argue that the Complaint shows that the attack in question occurred at 3:30 a.m. during normal sleeping hours, no Defendant actually witnessed the attack, and Gunsolley obtained medical help for Jack at either 6:30 a.m. or 11 a.m.  These facts indicate that Jack cannot objectively show deliberate indifference.

With respect to housing decisions, aside from Jack's own demeanor, the Complaint identifies no indication of an objectively ascertainable risk to Jack's safety during the initial housing at the Jail.  There are no allegations that Jack ever alerted staff that he either felt threatened by other prisoners or had an inability to cohabitate with them or those of different races.  Further, there is no indication at what point Jack's demeanor became "combative" enough to warrant segregation.  Moreover, there are no further allegations that either Pearson or Gunsolley processed Jack into the Jail, decisively assigned him to the group housing unit, or otherwise had an objective role in classifying him.

With respect to monitoring prisoners, the Complaint does not indicate that a reasonable officer would have appreciated a high risk to Jack.  There is no indication that Jack informed Jail staff that he needed to change cells.  Further, although the Complaint alleges that Jack was unconscious on the floor for several minutes at some time during the morning, it is reasonable to conclude that Jack and other inmates would have been asleep between 3:30 a.m. and Gunsolley's arrival at 6:00 a.m.  Officers do not have to physically rouse prisoners to perform a safety check.  Also, no facts indicate that Gunsolley was deliberately indifferent to a serious medical need because the Complaint alleges that he obtained medical attention for Jack.

With respect to Sheriff Christianson and Lt. Dailey, the Complaint contains no allegations that personally connect them to the attack against Jack or to medical attention provided to Jack.  Although Jack alleges that Christianson and Dailey created written policies and procedures that were contrary to state regulation, the fact remains that they were not present, were not informed of the circumstances as they were occurring, and did not have an opportunity to take alternative

measures. There are no allegations that these defendants made any decisions as to Jack specifically. The Complaint contains only conclusory allegations regarding unconstitutional customs, practices, and ratification.

*Plaintiff's Opposition*

Jack argues that the allegations against the Defendants are sufficient. With respect to Pearson, he is alleged to be the person responsible for placing Jack into a group unit while knowing that Jack was in a confrontational mood. State regulations require considering Jack's criminal sophistication, which was no prison or criminal history. Jack's mood and lack of prison knowledge created a danger that Jack would get into a fight. Pearson also failed to provide Jack with a mattress. Although Pearson briefly intervened once Jack got into an argument with a much larger prisoner over a mattress, Pearson left the unit and allowed for further escalation. Jack's argument may also have been fueled by racial tensions. If Pearson left his post, he would be in violation of state regulation which required at least one guard to be immediately available and accessible. Finally, given the blood on Jack's face and his erratic behavior, it is apparent that Pearson did not conduct the hourly safety checks required by regulation. Pearson's repeated violation of state regulations and failure to take common sense measures to prevent a fight demonstrate deliberate indifference/reckless disregard.

With respect to Gunsolley, California regulation mandates regular safety checks of prisoners. Jack spent several minutes on the floor unconscious, and afterwards had a bloody head and was mentally incoherent. Yet from 3:30 a.m. to 11:15 a.m., neither Pearson nor Gunsolley noticed anything irregular. The failure to notice anything until another prisoner said something shows that Gunsolley did not make the required safety checks. Any ignorance of Jack's condition is the result of a willful disregard state regulations.

With respect to Christianson and Dailey, these Defendants are alleged to be administrators who were designated to establish polices and training regarding prisoner classification, housing, provision of bedding, and safety monitoring. There is a reasonable inference that Christianson and Dailey permitted deputies to ignore hourly safety check requirements because two guards working consecutive shifts both failed to perform these checks seven or eight times in a row. Also, given

the County's failure to investigate Jack's injuries and its efforts to obstruct his investigation, there is enough evidence to suggest that discovery will reveal evidence to support claims of deliberate indifference.

### *Legal Standard*

Pre-trial detainees possess personal security interests that are protected by the Fourteenth Amendment. See Castro v. County of L.A., 833 F.3d 1060, 1069-71 (9th Cir. 2016) (en banc); Redman v. County of San Diego, 942 F.2d 1435, 1443 (9th Cir. 1991) (en banc). In order to recover for injuries suffered while in custody, a pre-trial detainee "must show that the prison official acted with 'deliberate indifference.'" Castro, 833 F.3d at 1067-68; Redman, 942 F.2d at 1443. The elements of a Fourteenth Amendment failure to protect claim are: "(1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) Those conditions put the plaintiff at substantial risk of suffering serious harm; (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (4) By not taking such measures, the defendant caused the plaintiff's injuries." Castro, 833 F.3d at 1071. "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn on the facts and circumstances of each particular case.'" Id. (quoting Kingsley v. Hendrickson, 135 S.Ct. 2466, 2473 (2015)). The third element is "more than negligence but less than subjective intent -- something akin to reckless disregard." Id.

### *Discussion*

Jack brings Fourteenth Amendment claims against the four individual defendants in their individual capacities. The claims against Sheriff Christianson and Lieutenant Dailey are based on their conduct in promulgating and administering policies and practices. The claims against Pearson and Gunsolley are based on their actual conduct towards Jack by failing to protect, failing to properly monitor, and failing to obtain medical treatment. The Court will examine each group of Fourteenth Amendment claims separately.

1.     <u>Failure to Protect</u>

Based on the opposition and Complaint, Jack contends that Pearson failed to protect him from another prisoner/detainee. Viewing the Complaint's allegations as true and in the light most favorable to Jack, <u>see</u> <u>Faulkner</u>, 706 F.3d at 1019, Pearson was aware that Jack was in a combative mood and had not been provided a mattress. Pearson was aware that Jack was arguing with a fellow prisoner over a mattress at 3:30 a.m. and the other prisoner significantly outweighed Jack. Although Pearson spoke briefly to Jack and the inmate, Pearson allegedly left the area, and then Jack was immediately attacked. By allegedly leaving the area unattended by an accessible guard, Pearson created an opportunity for the attack to occur and violated 15 C.C.R. § 1027. Pearson also somehow failed to properly perform visual observation safety checks in violation of 15 C.C.R. § 1006 and § 1027.5.[2] Moreover, the allegation that the attack occurred just after Pearson left the area inferentially indicates that the argument or confrontation was serious and had not been diffused.[3]

The above facts indicate that Pearson was aware of a significant confrontation between Jack and another inmate who outweighed him by 130 lbs., yet Pearson did nothing but leave the area unattended and fail to diffuse the situation. A significant confrontation between a smaller combative prisoner and a much larger prisoner over a mattress at 3:30 a.m. would seem to represent an obvious risk to prisoner safety and prison order. Walking away from such a

---

[2] Although not determinative, some courts have recognized that violations of regulatory duties may be considered as part of the totality of the circumstances in determining whether a defendant acted with "deliberate indifference." <u>See</u> <u>Blackmon v. Sutton</u>, 2015 U.S. Dist. LEXIS 3045, *17-*18 (D. Kan. Jan. 12, 2015) (rejecting a prisoner's motion for new trial when the jury was instructed to consider a regulation relating to medical treatment of a prisoner as part of the evidence as a whole relating to deliberate indifference); <u>Miles v. Jones</u>, 2010 U.S. Dist. LEXIS 139617, *26-*27 (S.D. Fla. Nov. 22, 2010) (noting that there was insufficient evidence that a guard was deliberately indifferent to the safety of a prisoner including <i>inter alia</i> the absence of a flagrant violation of a regulatory duty); <u>cf.</u> <u>Castro</u>, 833 F.3d at 1073 (noting violations of regulations); <u>A.G. v. Burroughs</u>, 2015 U.S. Dist. LEXIS 118350, at *13-14 (D. Or. June 22, 2015) (holding that a minor had adequately alleged that a social worker was deliberately indifferent where the social worker's certification of foster parents suffered from six significant errors/problems and violated a regulation).

[3] The Court notes that Jack alleges that he and the larger prisoner were of different races and that this was significant. Without some indication of an expressed or known racial animus by either Jack or the prisoner, the fact Jack and the other prisoner were of different races is irrelevant. <u>Cf.</u> <u>Bingham v. City of Manhattan Beach</u>, 341 F.3d 939, 949 (9th Cir. 2003) (finding no evidence of a viable Fourteenth Amendment Equal Protection claim where the evidence showed only that plaintiff and the officer were different races and there was a disagreement over the reasonableness of the officer's detention).

confrontation or otherwise failing to take additional steps to protect Jack or diffuse the situation could represent a reckless disregard to Jack's right to safety. Therefore, the allegations plausibly indicate that Pearson was deliberately indifferent to a substantial danger to Jack from a physical confrontation between Jack and the much larger prisoner when Pearson did not diffuse the situation and completely left the area. Cf. Castro, 833 F.3d at 1073. Dismissal of the Fourteenth Amendment claim against Pearson for failure to protect is inappropriate at this time.

2.      Failure to Properly Monitor[4]

The Complaint alleges that Pearson and Gunsolley failed to properly perform mandatory safety checks. See Complaint ¶ 67. However, the Complaint does not explain how the safety checks were improperly performed. Alleging that the checks were improperly performed is a general allegation that could mean any number of things. For example, it could mean an outright failure to perform any safety checks, or it could mean that one step of a multi-step process was not performed, or it could mean that insufficient attention was given to one or all steps in the process. Without more, merely alleging that an act was not properly performed is the language of negligence, it is not the language of deliberate indifference/recklessness. Further, the Complaint does not identify any facts that would show that a reasonable person in the deputies' respective positions would have been aware of a substantial risk of harm to Jack posed by the conditions of confinement that the deputies imposed, i.e. the manner of performing safety checks. Without some clearer description of how Pearson and Gunsolley failed to properly perform safety checks, as well as a clearer description of the risk to Jack created by the deputies' respective conduct in performing the safety checks (if they did), there is at best a negligence claim that is pled, but not a plausible Fourteenth Amendment deliberate indifference claim. Dismissal of the monitoring claim is appropriate.

---

[4] The parties do not expressly address whether *Castro*, a failure to protect case, applies to this type of claim. *Castro*'s holding is based on *Kingsley v. Hendrickson*, 135 S.Ct. 2466 (2015), an excessive force case. Some courts have limited *Kingsley*'s reach to only excessive force claims, e.g. Alderson v. Concordia Par. Corr. Fac., 848 F.3d 415, 420 (5th Cir. 2017), while the Second Circuit has held that *Kingsley* applies to all pre-trial detainee deliberate indifference conditions of confinement claims. See Darnell v. Pineiro, 849 F.3d 17, 35 (2d Cir. 2017). Since the parties assume that *Castro* and *Kingsley* apply to this claim, the Court will assume as well.

3.   Delay In Obtaining Medical Treatment[5]

The Complaint alleges that Gunsolley summoned or obtained medical help around 11:00 a.m. after another prisoner informed him that Jack needed help.  See Complaint ¶¶ 70, 72.  Prior to 11:00 a.m., there are no allegations that Pearson or Gunsolley knew that Jack needed medical assistance, or that these deputies were aware of facts that would lead a reasonable person to believe that Jack needed medical assistance, but failed to summon help.  That is, nothing indicates that the facts that were known to Pearson or Gunsolley would have led a reasonable person to recognize that Jack faced a substantial risk of harm if medical assistance was not obtained.  See Castro, 833 F.3d at 1071, 1073 (stating the elements of a Fourteenth Amendment failure to protect claim and holding that a plaintiff need not prove a subjectively culpable state of mind and identifying the facts that were known to the officers that indicated an objectively substantial risk of harm); Lolli v. County of Orange, 351 F.3d 410, 419 (9th Cir. 2003) (holding prior to Castro that in a Fourteenth Amendment medical needs claim that a defendant guard will be liable if inter alia he is aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and then actually draws the inference that a substantial risk of harm exists); see also Lau v. Kekuaokalani, 2017 U.S. Dist. LEXIS 116365, *7-*8 (D. Haw. July 25, 2017) (attempting to synthesize Castro's elements to a medical needs claim and identifying as an element that "the defendant was aware of plaintiff's request or need for medical care"); cf. Hallett v. Morgan, 296 F.3d 732, 745-46 (9th Cir. 2002) (noting that an Eighth Amendment claim for delay of medical treatment requires a showing that the prisoner suffered significant harm from the delay and that the defendant knew or should have known that the delay would cause significant harm).  Although the Complaint alleges that Jack was unconscious on the floor for several minutes, had blood on his head or face, and was acting erratically, the Complaint does not allege a time frame for Jack's condition or allege that the deputies actually observed these aspects of Jack's condition.  Without observation of such facts, a reasonable person would not be aware of a substantial risk to Jack by

---

[5] Again, the parties do not expressly address whether Castro applies to this type of claim, cf. Darnell, 849 F.3d at 35 with Guy v. Metropolitan Gov't of Nashville, 687 F. App'x 471 (6th Cir. 2017) (analyzing excessive force claim under Kingsley but analyzing medical needs claim under Eighth Amendment standards), and courts within this circuit have indicated that the issue is unsettled.  E.g. Buckins v. McCoy, 2017 U.S. Dist. LEXIS 72243, *8 n.2 (N.D. Cal. May 11, 2017).   As the parties assume that Castro applies, for purposes of this motion, the Court does so as well.

failing to obtain medical assistance.  See Castro, 833 F.3d at 1071, 1073; Lolli, 351 F.3d at 419;

see also Lau, 2017 U.S. Dist. LEXIS 116365 at *7-*8; cf. Hallett, 296 F.3d at 745-46.  Thus, the

Complaint does not allege a plausible claim for delay in obtaining medical treatment, and

dismissal of this claim is proper.

        4.     Supervisory Liability

Supervisory officials are not liable under § 1983 for the actions of their subordinates "on

any theory of vicarious liability."  Crowley v. Bannister, 734 F.3d 967, 977 (9th Cir. 2013).  "[A]

prison official in a supervisory position may be held liable under § 1983 if he was personally

involved in the constitutional deprivation or a sufficient causal connection exists between his

unlawful conduct and the constitutional violation."  Lemire v. California Dep't of Corr. & Rehab.,

726 F.3d 1062, 1085 (9th Cir. 2013).   A sufficient causal connection can exist for the

supervisor's: (1) own culpable action or inaction in the training, supervision, or control of

subordinates; (2) their acquiescence in the constitutional deprivation of which a complaint is

made; or (3) for conduct that showed a reckless or callous indifference to the rights of others.  Id.;

Henry A. v. Willden, 678 F.3d 991, 1004 (9th Cir. 2012).  Liability may be imposed "if

supervisory officials implement a policy so deficient that the policy itself is a repudiation of

constitutional rights and is the moving force of a constitutional violation."  Crowley, 734 F.3d at

977; Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989).

        a.     First Cause of Action – Improper Policies Or Practices

The Complaint does not indicate that Christianson and Dailey were present or participated

in any of the actions performed by Pearson or Gunsolley.  Rather, the Complaint indicates that

Christianson and Dailey established written and unwritten procedures that violated mandatory

state regulations, and the first cause of action appears to allege that Christianson and Dailey

subjected or allowed Jack to be subjected to improper policies and procedures, improper jail

classification procedures, improper custodial and medical monitoring, and delay and denial of

access to medical care.  See Complaint ¶¶ 48, 49, 50, 78.  However, the actual policies and

procedures are not identified.  More to the point, the deficiencies in the policies and procedures

that cause constitutional problems are not identified.  Simply alleging that an unknown policy

somehow violates a state regulation in an unknown way does not plausibly show "a policy so deficient that the policy itself is a repudiation of constitutional rights . . . ." Crowley, 734 F.3d at 977. To plausibly allege that Christianson and Dailey implemented constitutionally deficient policies or practices, Jack must identify the policy or practice that is at issue and what about the policy or practice makes it a repudiation of constitutional rights. Cf. id.; McFarland v. City of Clovis, 163 F.Supp.3d 798, 802 (E.D. Cal. 2016) (explaining requirements for alleging a plausible claim against an entity for a deficient policy, custom, or practice). Because Jack has not done so, no plausible claim is alleged against Christianson and Dailey and dismissal is appropriate.

Jack argues that the conduct of Pearson and Gunsolley shows that there are deficient policies and practices at the Jail. In the context of *Monell*, the Supreme Court has held that "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the [municipality] liable." City of Canton v. Harris, 489 U.S. 378, 391 (1989). Proof of one or two incidents of errant behavior is insufficient to demonstrate the existence a custom or widespread practice. See Oyenik v. Corizon Health, Inc., 2017 U.S. App. LEXIS 10783, *3-*4 (9th Cir. June 19, 2017) (noting that "one or two incidents are insufficient to establish a custom or policy"); Davis v. City of Ellensburg, 869 F.2d 1230, 1234 (9th Cir. 1989) (holding that the actions of three low level employees were insufficient to show policy or custom); Meehan v. Los Angeles Cnty., 856 F.2d 102, 107 (9th Cir. 1988) (holding that two incidents insufficient to show a custom). The conduct of Pearson and Gunsolley represent two instances of errant behavior by low level employees; it does not demonstrate a policy, practice, or custom. See id.

Jack also argues that because the Defendants have access to relevant and necessary information, a relaxed pleading standard should apply. The Ninth Circuit has recently held that the "plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." Park v. Thompson, 851 F.3d 910, 928-29 (9th Cir. 2017) (quoting Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010)). However, while allegations based on

information and belief are proper when the facts are peculiarly within the defendant's possession, such allegations must still identify facts; conclusory allegations based on information and belief are improper. See Blantz v. Cal. Dep't of Corr. & Rehab., 727 F.3d 917, 926-27 (9th Cir. 2013). *Iqbal* requires that the pleaded facts demonstrate a plausible claim. See Iqbal, 556 U.S. at 678-79. "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. Unless the factual allegations as a whole, whether pled without limitation or "on information and belief," demonstrate a plausible claim, the discovery process for that claim will not be opened. See id.; Park, 851 F.3d at 928-29; Blantz, 727 F.3d at 926-27. Here, the Complaint's factual allegations with respect to the first cause of action are not sufficient to nudge the claims against Christianson and Dailey into the realm of plausibility.

> **b.** Second Cause of Action – Failure to Train or Supervise

The Complaint alleges that Christianson and Dailey failed to properly train and supervise their staff to ensure the health and safety of pre-trial detainees and to ensure that all prisoners be provided with necessary classification, bedding, monitoring, and medical care. See Complaint ¶ 83. The Complaint also alleges that Christianson and Dailey either participated in or knew of their subordinates' deliberate indifference of failing to provide prisoners with necessary classification, provisioning, monitoring, and medical care, which caused injury or death. See id. at ¶ 84. The Complaint alleges that Christianson and Dailey had unconstitutional customs, policies and practices, ratified Pearson and Gunsolley's misconduct, and set in motion a series of acts by their subordinates that they knew would result in deprivations of Jack's rights. See id. at ¶¶ 85, 86.

With respect to ratification, a supervisor can be held liable for ratifying the unconstitutional of his subordinates. See Watkins v. City of Oakland, 145 F.3d 1087, 1093-94 (9th Cir. 1998). "Ratification" is the approval of a subordinate's decision and the basis for the subordinate's decision. See Sheehan v. City & County of San Francisco, 743 F.3d 1211, 1231 (9th Cir. 2014), *reversed on other grounds*, 135 S.Ct. 1765 (2015). Ratification involves a deliberate choice to endorse the acts of subordinates. See id. Ratification is more than acquiescence, and a mere failure to discipline does not amount to ratification. See id. Here, there

are no allegations under this cause of action that Christianson or Dailey were aware of Pearson and

Gunsolley's actions,[6] nor are there any factual allegations that show or explain how Christianson

or Dailey endorsed Pearson and Gunsolley's actions.  There is only a bare allegation of

endorsement and ratification, which is insufficient.  See Iqbal, 556 U.S. at 678-79; Sheehan, 743

F.3d at 1231.  Further, since there are no plausible constitutional violations alleged against

Gunsolley, there is no unconstitutional conduct by Gunsolley that could be ratified by

Christianson and Pearson.

      With respect to policies and customs, the Court has already addressed the matter.  The

Complaint does not identify the particular policy or custom and does not identify how the

particular policy or custom amounts to a repudiation of constitutional rights.  See Crowley, 734

F.3d at 977.

      With respect to failing to train or supervise, the relevant allegations are not clear and it is

unknown what Jack is attempting to allege.  While it is clear that Jack is alleging that Christianson

and Dailey were aware of unknown deliberate indifferent conduct by unknown deputies both

sometime before and sometime after the incident with Jack, see Complaint ¶ 84, that is all that

appears to be alleged.  There are no further allegations that describe training, the absence of

training, or how training is deficient, and there are no allegations that describe supervision, the

absence of supervision, or how supervision is deficient.  Further, the Complaint alleges that the

policies and customs of Christianson and Dailey set in motion a series of acts by subordinates that

the supervisors knew would cause the deprivation of Jack's rights.[7]  See id. at ¶ 86.  However, as

explained above, the policies and practices, as well as the deficiencies in those policies and

practices are not adequately alleged.  Further, the facts do not indicate that the policies and

practices amount to a repudiation of constitutional rights.  See Crowley, 734 F.3d at 977; Hansen,

885 F.2d at 646.  Beyond policies or customs, the Complaint does not identify any discrete acts by

---

[6] Under the third cause of action for *Monell* ratification, Jack alleges that Christianson and Dailey had knowledge of Pearson and Gunsolley's actions.  See Complaint ¶ 92.  However, the third cause of action also fails to state a plausible claim.  See Discussion *infra*.  Moreover, even considering the allegations in Paragraph 92 under the second cause of action, the result would not change.  There remains no explanation of how Christianson or Dailey endorsed or ratified Pearson and Gunsolley's actions.

[7] The Court notes that the only constitutional violation that is plausibly alleged is a failure to protect by Pearson.

14

Christianson or Dailey that put specific forces in motion with respect to any violation of Jack's constitutional rights.  Because the allegations are unclear and conclusory, no plausible claim is pled and dismissal is appropriate.

## II.    *Monell* Claims

### *Defendant's Arguments*

The County argues that the Complaint merely lists a number of deficiencies and then attributes those deficiencies to improper policies and customs.  The *Monell* allegations are vague and entirely conclusory.  Further, there are not a sufficient number of other similar and frequent instances identified in the Complaint that would support the existence of a custom or practice.

### *Plaintiff's Opposition*

Jack argues that at the very least he has pled a claim against the County for condoning a regular practice of ignoring the state regulation of hourly safety checks through direct visual observation.  When two different deputies over an eight hour period fail to notice a prisoner's bloody face and erratic behavior, it is fair to say that failing to conduct the hourly well-being checks required by state law was an unwritten policy and practice of the Jail.  That inference is buttressed by the fact that Pearson and Gunsolley appear to have suffered no consequences for their poor conduct.  Courts have recognized that failing to conduct hourly visual safety checks amounts to deliberate indifference.  Further, the County's failure to provide records regarding Jack's housing classification, as well as the allegation that no classification was performed, support the inference that the Jail has a policy of ignoring state regulations regarding prisoner classification and housing/segregation.

### *Legal Standard*

Municipalities are considered "persons" under 42 U.S.C. § 1983 and therefore may be liable for causing a constitutional deprivation.  Monell v. Department of Soc. Servs., 436 U.S. 658, 690 (1978); Hunter v. County of Sacramento, 652 F.3d 1225, 1232 (9th Cir. 2011).  A municipality, however, "cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under [42 U.S.C. § 1983] under a *respondeat superior*

theory." Monell, 436 U.S. at 691; see Hunter, 652 F.3d at 1232. Liability only attaches where the municipality itself causes the constitutional violation through "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." Monell, 436 U.S. at 694; Price v. Sery, 513 F.3d 962, 966 (9th Cir. Or. 2008). Municipal liability may be premised on: (1) conduct pursuant to a formal or expressly adopted official policy; (2) a longstanding practice or custom which constitutes the "standard operating procedure" of the local government entity; (3) a decision of a decision-making official who was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (4) an official with final policymaking authority either delegating that authority to, or ratifying the decision of, a subordinate. See Thomas v. County of Riverside, 763 F.3d 1167, 1170 (9th Cir. 2014); Price, 513 F.3d at 966. A "'policy' is a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006). A "custom" for purposes of municipal liability is a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988); Los Angeles Police Protective League v. Gates, 907 F.2d 879, 890 (9th Cir. 1990). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1995). A municipal defendant will be liable only where the entity's policies or customs "evince a 'deliberate indifference' to the constitutional right and are 'the moving force' behind the constitutional violation.'" Rivera v. County of L.A., 745 F.3d 384, 389 (9th Cir. 2014). A municipality is deliberately indifferent when the need for more or different action is "so obvious, and the inadequacy [of the current procedure] so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." City of Canton v. Harris, 489 U.S. 378, 390 (1989); Mortimer v. Baca, 594 F.3d 714, 723

16

(9th Cir. 2010).  To properly allege *Monell* liability, a plaintiff must: (1) identify the challenged

policy/custom; (2) explain how the policy/custom is deficient; (3) explain how the policy/custom

caused the plaintiff harm; and (4) reflect how the policy/custom amounted to deliberate

indifference, i.e. show how the deficiency involved was obvious and the constitutional injury was

likely to occur.  McFarland, 163 F.Supp.3d at 802; Young v. City of Visalia, 687 F. Supp. 2d

1141, 1149-50 (E.D. Cal. 2009).  To show ratification, a plaintiff must prove that an official with

final policy-making authority approved a subordinate's decision or action and the basis for it.

Sheehan, 743 F.3d at 1231.  Stated differently, a final policymaker must make a deliberate choice

to endorse the subordinate's actions in order for the municipality to be liable.  Id.  "The

policymaker must have knowledge of the constitutional violation and actually approve of it," and a

"mere failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983

claim." Lytle v. Carl, 382 F.3d 978, 987 (9th Cir. 2004).  Similarly, the "mere failure to discipline

[a subordinate] does not amount to ratification of [the subordinate's] allegedly unconstitutional

actions."  Sheehan, 743 F.3d at 1231.

> *Discussion*

The third cause of action lists eleven policies, alleges a failure to properly hire, train, and

supervise, and ratification.  The Court will address each theory separately.

> a.    Policies, Customs, or Practices

The first policy or custom is failing to properly classify and house pre-trial detainees as

required by state law.  The Complaint can be fairly read to show that the policy led to Jack being

housed in an area that was allegedly unsuitable and unsafe.[8]  However, while a classification

policy and resulting harm are identified, what is not identified is how the policy is deficient and

how the deficient policy amounts to deliberate indifference.  There are myriad possible ways in

which a classification policy may be deficient, but it does not follow that every deficiency reflects

---

[8] The Court notes that the Complaint makes much of the fact that Jack was housed with 40 other individuals of mixed race even though Jack had never been in prison before.  However, as discussed above, there is no indication of racial animus.  Thus, there was no substantial risk posed to Jack simply by being housed with members of a different race.  Further, Jack cites no authority for the proposition that those who have never been in prison must be housed in isolation.  While other considerations may well show that the decision to place Jack in a group housing unit was unconstitutional (for example, Jack's own behavior or the nature of the prisoners who were in the unit), the mere fact that Jack had never been in prison does not show a constitutional violation.

a deliberate indifference to constitutional rights.  Therefore, there is no *Monell* claim that is plausibly alleged with respect to a classification policy.  See McFarland, 163 F.Supp.3d at 802; Young, 687 F. Supp. 2d 1141, 1149-50.

The second policy or custom is failing to properly provision prisoners with bedding as required by state law.  However, the Complaint does not allege what makes the policy deficient, how Jack was harmed by the policy, and how the deficient policy amounts to deliberate indifference to constitutional rights.  Thus, there is no plausible *Monell* claim alleged.  See McFarland, 163 F.Supp.3d at 802; Young, 687 F. Supp. 2d 1141, 1149-50.  Additionally, the facts alleged do not appear to demonstrate a constitutional violation with respect to bedding.  The allegations indicate that Jack did not have a mattress for one night.  In the Eighth Amendment context, the Ninth Circuit has recognized that a prisoner who was deprived of a mattress for a single night did not have a legally viable claim.  See Chappell v. Mandeville, 706 F.3d 1052, 1060 (9th Cir. 2013); Hernandez v. Denton, 861 F.2d 1421, 1424 (9th Cir. 1988), *vacated on other grounds*, 493 U.S. 801 (1989).  In this Fourteenth Amendment case, the same result appears to be warranted because it is unclear how not being provided with a mattress for one night represents a substantial risk to Jack's safety.  Cf. Castro, 833 F.3d at 1072.  While not being provided a mattress may be part of a constellation of other facts that could help to support a failure to protect claim, an independent constitutional violation is unclear.  If Pearson's failure to provide Jack with a mattress did not violate the constitution, then there is no *Monell* (or supervisory) liability for that conduct.  Jackson v. City of Bremerton, 268 F.3d 646, 653 (9th Cir. 2001).

The third policy or custom is failing to properly monitor pretrial detainees and other prisoners as required by state law.  The Complaint can be read is indicating that the failure to properly monitor was reflect by Pearson when he walked away from the housing area so that a guard was not accessible.  The Complaint can also be read as indicating that not having a guard present gave the other inmates the opportunity to assault Jack.  However, the County's liability must be based on a policy or custom, it cannot be based simply on the fact that Pearson allegedly left his post.  Jack must identify what about the County's monitoring is deficient and how that deficient policy or custom reflects deliberate indifference.  There are many ways that one can fail

to properly monitor, not all of which reflect deliberate indifference. Therefore, there is no *Monell* claim that is plausibly alleged with respect to a monitoring policy. See McFarland, 163 F.Supp.3d at 802; Young, 687 F. Supp. 2d at 1149-50. Additionally, as discussed above, the conduct of Pearson and Gunsolley is the conduct of two low level employees. It represents two sporadic events and does not show a custom or practice. See Oyenik, 2017 U.S. App. LEXIS 10783 at *3-*4; Davis, 869 F.2d at 1234; Meehan, 856 F.2d at 107.

The fourth policy or custom is failing to properly intervene when altercations are detected. The same deficiencies that are present with the third policy are present with the fourth. No deficiency in the policy or custom is identified and deliberate indifference is not apparent. Thus, there is no plausible *Monell* claim based on this policy. See McFarland, 163 F.Supp.3d at 802; Young, 687 F. Supp. 2d 1141, 1149-50. Additionally, it is unclear what is meant by "intervene." The facts of this case show that Pearson did "intervene" when Jack and the other inmate began their confrontation. It is unclear why that "intervention" by itself could be said to violate constitutional rights. Given the ambiguous nature of the policy and the facts alleged in the complaint, a constitutional violation is not present based on "improper intervention," which would defeat *Monell* (and supervisory) liability. See Jackson, 268 F.3d at 653.

The fifth policy or custom is failing to properly conduct hourly safety checks as required by state law. The Complaint can be fairly read is indicating that the failure to properly perform a safety check led to the exacerbation of Jack's cranial and brain injuries. Again, however, no deficiency is identified and it cannot be determined if the deficient policy reflects deliberate indifference. To be sure, some courts have recognized the importance of conducting safety checks in the context of *Monell* liability. See Frary v. County of Marin, 81 F.Supp.3d 811, 836 (N.D. Cal. 2015); Estate of Abdollahi v. County of Sacramento, 405 F.Supp.2d 1194, 1206-07 (E.D. Cal. 2005). However, there are many different ways in which a safety check may be "improperly" performed. Without an explanation in the Complaint of how the policy's safety checks are insufficient, there is no plausible claim alleged. McFarland, 163 F.Supp.3d at 802; Young, 687 F. Supp. 2d 1141, 1149-50. Additionally, as discussed above, the conduct of Pearson and Gunsolley is the conduct of two low level employees. It represents two sporadic events and does not reflect a

1  custom or practice.  See <u>Oyenik</u>, 2017 U.S. App. LEXIS 10783 at *3-*4; <u>Davis</u>, 869 F.2d at 1234;

2  <u>Meehan</u>, 856 F.2d at 107.

3       The sixth policy or custom is failing to provide prisoners who have serious medical

4  conditions with immediate necessary medical care.  If there is either a policy or custom of not

5  providing prisoners with medical care, and it was clear that a prisoner was harmed from the

6  application of that policy, the unconstitutionality of such a practice would be obvious and frankly

7  breathtaking.  However, assuming that such a clearly unconstitutional policy or custom exists at

8  the Jail, the facts alleged do not sufficiently indicate that it harmed Jack.  As described above,

9  there are no allegations that Pearson or Gunsolley were actually aware that Jack was acting

10  erratically, had been unconscious, had been attacked, or had blood on his face or head.  That is, the

11  allegations do not show that the deputies were aware either of the facts that demonstrated Jack

12  needed medical help or that they were actually aware that Jack needed medical help.  The facts

13  that are alleged indicate that when the situation was brought to the attention of Gunsolley by

14  another prisoner, Gunsolley obtained medical treatment.  There are no allegations of delay.  Thus,

15  the facts do not indicate that the alleged policy caused Jack harm.  Without harm from the policy

16  or custom, there is no plausible claim alleged.  <u>McFarland</u>, 163 F.Supp.3d at 802; <u>Young</u>, 687 F.

17  Supp. 2d at 1149-50.

18       The seventh policy or custom is failure to institute, require, and enforce proper and

19  adequate training and supervision.  *Monell* liability can be based on inadequate training.  <u>See</u>

20  <u>Blankenhorn v. City of Orange</u>, 485 F.3d 463, 484 (9th Cir. 2007); <u>Long</u>, 442 F.3d at 1186.

21  However, there are no deficiencies identified in the training and supervision, no description of

22  how the inadequate training and supervision caused harm, and no indication of how the inadequate

23  training and supervision reflects deliberate indifference.  Therefore, there is no plausible claim for

24  inadequate training.  <u>McFarland</u>, 163 F.Supp.3d at 802-03; <u>Young</u>, 687 F. Supp. 2d at 1149-50.

25       The eighth policy or custom is covering up violations of constitutional rights by failing to

26  properly investigate or evaluate injury-causing incidents.  The policy is essentially alleged to be

27  covering up injury events.  This is allegedly accomplished through failing to properly investigate.

28  Although there is no description of how the County fails to "properly" investigate, the allegation is

buttressed by the allegations that the County did not investigate the incident until over one year had elapsed and the FBI had made an inquiry. A policy of covering up constitutional violations by essentially not investigating can reasonably be viewed as reflecting deliberate indifference to constitutional rights. However, there are no allegations that explain how this policy or custom caused harm, i.e. was a moving force in Jack's injuries. See Rivera, 745 F.3d at 389. Therefore, a plausible claim has not been pled and dismissal is appropriate. McFarland, 163 F.Supp.3d at 802-03; Young, 687 F. Supp. 2d at 1149-50.

The ninth policy or custom is ignoring, by failing to properly and adequately investigate and discipline, unconstitutional or unlawful activity at the Jail "as described above." It is not clear what Jack is alleging. It appears to the Court that Jack may be attempting to claim a policy based on failing to properly investigate and discipline Pearson and Gunsolley for their actions towards Jack. However, there are no factual allegations in the Complaint that discuss discipline, and what occurred in this case is one incident, against one person (Jack), by one deputy (Pearson).[9] Without more, it is a "sporadic" event that is not a formal edict of the County or policy maker and it is not widespread or longstanding. The events of this case are not policies or customs. See Long, 442 F.3d at 1185; Trevino, 99 F.3d at 918. Because none of the necessary factual allegations are sufficiently made for this unduly vague policy or custom, no plausible claim has been pled and dismissal is proper. McFarland, 163 F.Supp.3d at 802-03; Young, 687 F. Supp. 2d at 1149-50.

The tenth policy or custom is allowing, tolerating or encouraging deputies to fail to file complete and accurate reports, to file false reports, to make false statements, to intimidate, bias and/or "coach" witnesses to give false information and/or to attempt to bolster deputies' stories, and obstructing or interfering with investigations of unconstitutional conduct by withholding and/or concealing material information. The policy is essentially one of falsification and obstruction of police reports and investigations. Specific acts of obstruction are identified. The allegation is further bolstered by the allegations that the County falsely stated that an investigation was on-going when it was not, and by the alleged failure to turn over all relevant documents related to this incident. A policy of falsification and obstruction of reports and investigations into

---

[9] As discussed above, there are no plausible constitutional violations pled against Gunsolley.

constitutional rights can reasonably be viewed as reflecting deliberate indifference. However, there are no allegations that explain how this policy or custom was a moving force in Jack's injuries. See Rivera, 745 F.3d at 389. Therefore, a plausible claim has not been pled and dismissal is appropriate. McFarland, 163 F.Supp.3d at 802-03; Young, 687 F. Supp. 2d at 1149-50.

Finally, the eleventh cause of action alleges a policy or custom of refusing lawful requests by injured parties for public records relating to their injuries. Based on the allegations in the Complaint, the Court reads this policy as being based on the failure of the County to respond to requests for information made pursuant to the California Public Records Act. However, the failure to provide public records pursuant to State law does not in and of itself implicate federal constitutional rights or protections. There are no allegations that explain how this policy caused Jack harm or how it reflects deliberate indifference to federal constitutional rights. Therefore, a plausible claim has not been pled and dismissal is appropriate. McFarland, 163 F.Supp.3d at 802-03; Young, 687 F. Supp. 2d at 1149-50.

### b.    Action Of Policy-Makers

The Complaint alleges that Christianson and Dailey were policy makers who failed to properly hire, train, instruct, monitor, supervise, investigate, manage, and discipline Pearson, Gunsolley, and others who acted with deliberate indifference to Jack's rights. See Complaint ¶ 91. The allegation is entirely conclusory. There are no factual allegations that in any way relate to the hiring of Pearson and Gunsolley. There are no factual allegations that describe the training received or how the training was constitutionally deficient. There are no factual allegations that describe how Pearson and Gunsolley were supervised or how the supervision was deficient. Further, the mere failure to discipline a subordinate or overrule a decision does not constitute ratification. See Sheehan, 743 F.3d at 1231; Lytle, 382 F.3d at 987. Like the policy and custom allegations, additional factual allegations are necessary, be they allegations made on "information and belief" or otherwise. Because no plausible claim for "policy maker" liability is alleged, dismissal is appropriate.

c.    Ratification

The Complaint alleges that Christianson and Dailey ratified the conduct of Pearson and Gunsolley, that the details of the incident with Jack were made known to Christianson and Dailey, that Christianson and Dailey had direct knowledge of the fact that Jack was denied numerous rights and accommodations, but Christianson and Dailey made a deliberate decision do endorse such conduct and the basis for it.  See Complaint ¶ 92.

The allegations track many of the necessary elements of ratification.  See Sheehan, 734 F.3d at 1231.  The Court accepts that Christianson and Dailey knew of the details of Pearson and Gunsolley's conduct towards Jack.  However, there is no explanation given about how Christianson and Dailey approved and endorsed Pearson and Gunsolley's conduct.  Simply alleging endorsement is the same as alleging ratification, both represent bare legal conclusions. Additionally, as discussed above, there are no plausible constitutional claims alleged against Gunsolley.  Therefore, Christianson and Dailey could not have endorsed any unconstitutional behavior by Gunsolley.  Because a plausible claim of ratification by a policy-maker has not been pled, dismissal is appropriate.

**III.    California Government Code § 845.6**

*Defendants' Arguments*

Defendants argue that liability under § 845.6 is limited to failing to obtain medical help. The Complaint does not allege that any Defendants were aware of Jack's need for medical help, but failed to summon help after perceiving the need.  While the Complaint indicates that Gunsolley should have deduced earlier that medical attention was needed, that is not a duty included under § 845.6.

*Plaintiff's Opposition*

Jack argues that facts alleged demonstrate that Pearson and Gunsolley had constructive knowledge of Jack's injuries because those injuries were noticeable.  It cannot be reasonably inferred from the Complaint that Jack was merely sleeping or that his injuries were not noticeable.

*Legal Standard*

Government Code § 845.6 applies to prisoners.  Cal. Gov. Code § 845.6; <u>Lawson v.</u>

<u>Superior Ct.</u>, 180 Cal.App.4th 1372, 1383-84 (2010).  In relevant part, Government Code § 845.6

reads:  "Neither a public entity nor a public employee is liable for injury proximately caused by

the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but, . . .

a public employee . . . is liable if the employee knows or has reason to know that the prisoner is in

need of immediate medical care and he fails to take reasonable action to summon such medical

care."  Thus, in order to state a claim under § 845.6, a prisoner must establish three elements: (1)

the public employee knew or had reason to know of the need (2) for immediate medical care, and

(3) failed to reasonably summon such care.  <u>Jett v. Penner</u>, 439 F.3d 1091, 1098-99 (9th Cir.

2006); <u>see also</u> <u>Lawson</u>, 180 Cal.App.4th at 1383-84.  "Liability under section 845.6 is limited to

serious and obvious medical conditions requiring immediate care."  <u>Jett</u>, 439 F.3d at 1098-99

(quoting Watson v. California, 21 Cal.App.4th 836, 841 (1993)).

*Discussion*

The analysis above with respect to the Fourteenth Amendment medical needs claim applies

to this claim.  Although the Complaint alleges that Jack was acting erratically, had been

unconscious for several minutes, and had blood on his head or face, there are no allegations that

Pearson and Gunsolley actually saw these symptoms or Jack's condition.  If Pearson and

Gunsolley did not actually see these symptoms or Jack's condition, then they neither knew or nor

did they have reason to know that Jack needed immediate medical care.  When Jack's condition

was pointed out to Gunsolley by another prisoner, Gunsolley summoned medical help.  Therefore,

as pled, there is no plausible § 845.6 claim and dismissal is appropriate.

**ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1.       Defendants' motion to dismiss is DENIED with respect to the Fourteenth Amendment

failure to protect claim against Defendant Pearson;

2. Defendants' motion to dismiss is otherwise GRANTED and all other claims are DISMISSED with leave to amend;[10]

3. Plaintiff may file an amended complaint that is consistent with the analysis of this order and Rule 11 within twenty-eight (28) days of service of this order; and

4. If Plaintiff fails to timely file an amended complaint, Defendants shall file an answer within thirty-five (35) days of service of this order.

IT IS SO ORDERED.

Dated: __September 15, 2017__          _____

SENIOR DISTRICT JUDGE

---

[10] After consideration, it is not clear to the Court that amendment of the dismissed claims would be futile. Therefore, leave to amend will be permitted. See Garmon, 828 F.3d at 842.