1
2
3
4
5       **UNITED STATES DISTRICT COURT**

6       **EASTERN DISTRICT OF CALIFORNIA**

7

8    **JAMES JACK, JR.,**                          **CASE NO. 1:17-CV-0520 AWI SAB**

9                    **Plaintiff**

10               **v.**                             **ORDER ON DEFENDANTS' THIRD
                                                    MOTION TO DISMISS**
11   **STANISLAUS COUNTY DEPUTY
     SHERIFF ERIC PEARSON,**                        (Doc. No. 33)
12
                     **Defendant**
13

14

15          This case stems from a violent confrontation between Plaintiff James Jack, Jr. ("Jack") and

16   a fellow detainee at the Stanislaus County Jail.  Jack is pursuing claims against Stanislaus County

17   Sheriff's Deputy Eric Pearson ("Pearson") for violations of the Fourteenth Amendment under 42

18   U.S.C. § 1983 and state law negligence.[1]  Currently before the Court is Pearson's motion for

19   summary judgment.  For the reasons that follow, the motion will be granted as to Jack's § 1983

20   claims, and the Court will decline to exercise supplemental jurisdiction over the state law claims.

21

22                              **RULE 56(a) FRAMEWORK**

23          Summary judgment is proper when it is demonstrated that there exists no genuine issue as

24   to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R.

25   Civ. P. 56; <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970); <u>Fortyune v. American Multi-</u>

26   <u>Cinema, Inc.</u>, 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears

27

28   _____
     [1] Through a Rule 41(a) stipulation, Deputy and Cody Gunsolley was dismissed from this case with prejudice on
     September 17, 2019.  <u>See</u> Doc. Nos. 52, 55.

the initial burden of informing the court of the basis for its motion and of identifying the portions of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). A fact is "material" if it might affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); United States v. Kapp, 564 F.3d 1103, 1114 (9th Cir. 2009). A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. Anderson, 477 U.S. at 248; Freecycle Sunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. Soremekun, 509 F.3d at 984. Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim. See James River Ins. Co. v. Herbert Schenk, P.C., 523 F.3d 915, 923 (9th Cir. 2008); Soremekun, 509 F.3d at 984. If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103. The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

The opposing party's evidence is to be believed, and all justifiable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Narayan v. EGL, Inc., 616 F.3d 895, 899

(9th Cir. 2010). While a "justifiable inference" need not be the most likely or the most persuasive inference, a "justifiable inference" must still be rational or reasonable. See Narayan, 616 F.3d at 899. Summary judgment may not be granted "where divergent ultimate inferences may reasonably be drawn from the undisputed facts." Fresno Motors, LLC v. Mercedes Benz USA, LLC, 771 F.3d 1119, 1125 (9th Cir. 2015); see also Holly D. v. Cal. Inst. of Tech., 339 F.3d 1158, 1175 (9th Cir. 2003). Inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Fitzgerald v. El Dorado Cnty., 94 F.Supp.3d 1155, 1163 (E.D. Cal. 2015); Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008). "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002). The parties have the obligation to particularly identify material facts, and the court is not required to scour the record in search of a genuine disputed material fact. Simmons v. Navajo Cnty., 609 F.3d 1011, 1017 (9th Cir. 2010). Further, a "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'" Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006). If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment. Nissan Fire, 210 F.3d at 1103.

## FACTUAL BACKGROUND[2]

On March 7, 2016, Ceres Police Officers Gallegos and Vera were dispatched to Jack's home on a call for a family disturbance. See PUMF's 1, 2, 3. Officer Vera arrested Jack based on an outstanding warrant. See JUMF 1; PUMF's 1, 2. As Jack was escorted to the patrol car, he was being "mouthy," yelling and cursing. See PUMF 3. Vera transported Jack to the Stanislaus

---

[2] "DUMF" refers to Defendant's Undisputed Material Facts," "PUMF" refers to "Plaintiff's Undisputed Material Fact," and "JUMF" refers to "Joint Undisputed Material Facts." The parties make various objections or clarifications in response to a PUMF or DUMF. To the extent that the Court utilizes a DUMF or PUMF, any objection thereto is deemed overruled.

County Downtown Men's Jail ("Jail").  <u>See</u> JUMF 1; PUMF 4.  During transport, Jack was "very argumentative" and "really aggressive" to the point where Vera felt that Jack was probably under the influence of a some type of controlled substance.  PUMF 5.

Jack and Vera arrived at the jail at 1:14 a.m.  <u>See</u> JUMF 1.  Vera escorted Jack through booking at the jail.  <u>See</u> PUMF 6.  During his time with Vera, Jack was cursing and so argumentative that Vera expected Jack to become physically uncooperative.  <u>See id.</u>  Vera testified that, due to Jack's argumentativeness, Jack "was somebody that I would have expected to be under the influence or physically confrontational."  <u>Id.</u>; <u>see also</u> PUMF 7.

At 1:30 a.m., Deputy Delgadillo conducted an intake screening interview with Jack for medical and classification purposes.  <u>See</u> JUMF 3.  Jack's screening interview was routine, and Jack was cooperative and answered all questions.  <u>See id.</u>  During the screening interview, Jack denied gang affiliations, having enemies, taking drugs (except for Xanax), and feeling like hurting himself.  <u>See</u> JUMF 4.  Deputy Delgadillo determined that Jack did not need medical attention.  <u>See id.</u>  After the screening interview, Classification Deputy Mauldin determined that Jack was new to jail custody, had no specific problems, and was fine with general population housing.  JUMF 5.  The intake screening and classification information provided no indication that Jack would be inappropriate for housing with other inmates.  <u>See</u> JUMF 6.  Therefore, Deputy Mauldin assigned Jack to the Inmate Worker Quarters (the "IWQ"), bunk No. 45.  JUMF 5.

The IWQ was a two-level dormitory type housing unit with 62 inmate bunks and was an area where general population inmates could move freely around the unit.  JUMF 8.   The IWQ had bunks on both levels.  JUMF 9.  An office for the IWQ housing deputy was located on the upper level within the IWQ.  <u>Id.</u>  The housing deputy assigned to the IWQ was responsible for counts and hourly security checks of both levels.  <u>Id.</u>  The Jail was an indirect supervision facility, meaning that jail staff would observe each housing area within the allotted times for inmate count and hourly security rounds, but otherwise guards may not be present in inmate housing areas at all times.  <u>See</u> JUMF 7.  As of March 2016, the IWQ had video surveillance on the lower level but no cameras on the upper level of the IWQ.  <u>Id.</u>  These lower level cameras were monitored inside the control room on the first floor of the jail.  <u>See id.</u>

4

Deputy Pearson was assigned to work as the IWQ housing deputy from 6:00 p.m. on March 6, 2016 to 6:00 a.m. on March 7, 2016. See JUMF 15. Pearson had been a Stanislaus County corrections deputy since August 2013 and had worked as the IWQ housing deputy approximately 25 times before. See JUMF 13; see also PUMF's 8, 9, 10. Consistent with his prior experience, Pearson was the only staff assigned to supervise the IWQ during his shift. See JUMF 17. At the beginning of his shift, there was 51 inmates housed in the IWQ, but at the end of the shift, there were 54 inmates. See id. As the deputy covering IWQ, Pearson was responsible for picking up from temporary holding cells the newly booked prisoners who were assigned to the IWQ by the classification officer.[3] See PUMF 11. This happened once per shift, and the IWQ housing deputy was not called each time a prisoner was assigned to the IWQ. See id.

Around 3:00 a.m. on March 7, 2016, Pearson escorted Jack and eight other newly booked inmates into the IWQ. See DUMF 18; PUMF 11. During his initial interactions with Jack, Pearson noticed that Jack had "kind of a bad attitude" and rolled his eyes at Pearson when Pearson told Jack to do something. See DUMF 19; Pearson Depo. 35:11-21. Pearson's observations of Jack's body language led Pearson to believe that Jack was kind of arrogant and an "a-hole." See PUMF 12; Pearson Depo. 66:18-67:5. However, Jack did not disobey any order by Pearson. See DUMF 19. Pearson declares that Jack did not appear to be combative in any way and conveyed no signs of aggressiveness or assaultive behavior towards Pearson or other inmates. See Pearson Dec. ¶ 11; DUMF 19. Upon arrival at the IWQ, Pearson informed the new inmates of their assigned bunks and location; Jack was assigned bunk No. 45 on the upper level. See DUMF 22. Pearson then conducted an hourly security round and then went into the IWQ office to log in the new arrivals and verify the IWQ inmate count. See id. It appears Jack's bunk was missing a mattress. See Frederick Depo. 16:24-17:5. Jack did not notify Pearson that he did not have a mattress, and Pearson was not otherwise notified that Jack did not have a mattress. See PUMF 22.

Fellow IWQ prisoner Stephen Frederick testified that Jack arrived in the IWQ with a "really bad attitude" and was "talking a lot of shit." See PUMF 13; Frederick Depo. 10:2-6. Jack

---

[3] The classification officer, not the IWQ housing deputy, is responsible for housing and bunk assignments. See JUMF's 15, 16.

was "talking shit" in general to everybody in part because he did not have a mattress on his bunk and the other inmates appeared to be forcing Jack to get in to the shower.  See Frederick Depo. 10:7-14.  Jack was "making a fuss" about not having a mattress.  See id. at 16:24-17:5; PUMF 13.

Shortly after Pearson went into the IWQ office and began writing down the new receives, he heard raised voices that sounded like a verbal argument outside his office door.  See DUMF 23; PUMF 16.  Pearson did not know if the voices were yelling, see PUMF 16; Pearson Dep. 41:13-19, but he heard nothing that sounded like a physical altercation.  See DUMF 23.  Pearson heard the raised voices through the closed office door.  See PUMF 16.  The office door was solid and had no glass or mesh windows and was located approximately 20 feet away from bunk No. 45. See PUMF 17; Pearson Dec. ¶ 12.  Pearson immediately exited the IWQ office and saw Jack and another inmate (later identified as inmate Jordan Davis) standing no more than 20 feet away from the IWQ office.  See DUMF 24.  Pearson could not remember inmate Davis's name, he just recalled that Davis was "bigger" than Pearson and estimated that Davis outweighed Jack by 100 lbs.[4]  See PUMF 18.  When Pearson exited the IWQ office, Jack was already walking back toward his assigned bunk.  See DUMF 24.  However, Jack and Davis quieted down when they saw Pearson coming.  See PUMF 19.  Pearson spoke with inmate Davis, Jack, and other inmates standing in the area.  See DUMF 24.  The argument appeared to have been about a mattress on the wrong bunk.  See id.; see also PUMF 22.  Pearson asked inmate Davis if the issue was squashed, and Davis indicated that it was.  See DUMF 24.  Pearson asked the same of Jack, and Jack confirmed that the issue was done.  See id.  Pearson also asked several other inmates who were standing in the area if everything was good, if the issue was over, if everything was ok, and the other inmates confirmed that it was.  See id.  However, inmate Frederick indicated that prisoners will always tell officers that their dispute is resolved, even if it is not, because the prisoners want the officers to leave.  See PUMF 23.  Pearson did not obtain details about the argument between Jack and Davis.  See PUMF 22.  Neither Davis nor Jack looked angry and they did not exhibit any body language that would suggest that they would engage in a physical fight, such as balled fists or bladed stances.  See DUMF 24.  Pearson observed that there were mattresses on both Jack's and

---

[4] In fact, booking records indicate that Jack weighed 170 lbs. and Davis weighed 300 lbs.  See PUMF 21.

6

Davis's respective bunks.  See id.  Pearson had no information that Davis had ever acted aggressive or assaultive.  See DUMF 28.  The inmates dispersed, see id., but instead of going back to the IWQ office, Pearson left the area/the IWQ.[5]  See PUMF 25; Frederick Depo. 25: 9-19.  Pearson left the IWQ and went to the control room area of the jail to help the control deputy, as a matter of "past practice," but he could not recall anything specific that he did for the 30 to 40 minutes that he spent there.[6]  See PUMF 27; see also DUMF 26.  This left the second level of the IWQ unaccompanied and unmonitored.  See PUMF 28.

After Pearson left the IWQ, Jack and Davis instantly started fighting.  See PUMF 25.  Jack started the fight by swinging first at Davis.  See JUMF 41.  Davis then picked up Jack, slammed him to the ground/on the floor, and punched him in the head.  See id.; PUMF 33.  The whole argument and fight between Jack and Davis lasted a couple of minutes.  PUMF 26.  Jack remained on the floor "asleep" for about five minutes.  See PUMF 34.  Other inmates then took care of Jack and put him in his bunk after the physical altercation.  JUMF 42.  Jack laid on a mattress after the physical altercation.  JUMF 43.

Several hours after Pearson's shift ended, it was discovered that Jack needed medical assistance.  See DUMF's 46 to 51.[7]  After being transported to the hospital, it was discovered that Jack's skull was broken in several places and Jack's brain had been lacerated.  See DUMF 52; PUMF 35.  Physicians successfully performed surgery on Jack, including implanting a titanium plate.  See PUMF 35.  Jack's treatment at the hospital would not have been any different if he had arrived up to eight hours earlier.  See DUMF 55.  Jack has no memory of his arrest or the events of March 7, 2016 at the Jail, he only remembers waking up in a hospital with head pain.  JUMF 2.

---

[5] Pearson asserts that he went back into his office to finish paperwork and then waited further to listen and give the opportunity for any inmate to come and knock on the door.  See DUMF 25.  Pearson asserts that he heard nothing and no one came to his office door.  See id.  Pearson asserts that he then exited the office, took a look around, did not see anything that would cause him to walk around, then exited the IWQ area.  See id.  Jack maintains that Pearson immediately left the IWQ without going to his office.  See PUMF 25.  Because Jack is the non-moving party, the Court credits his version of events for purposes of this motion.  See Narayan, 616 F.3d at 899.

[6] Per Jail regulations in effect in 2016, the IWQ deputy position was "not a fixed post," and the deputy could "leave the housing area as needed."  See DUMF 11.

[7] The nature and extent of Jack's injuries are not the subject of this motion.  The Court summarizes several DUMF's and PUMF's for context only.

1    **DEFENDANT'S MOTION**

2    **I.    42 U.S.C. § 1983 – Fourteenth Amendment -- Failure To Protect**

3    *Defendant's Argument*

4    Pearson argues *inter alia* that Jack's claim based on Pearson not removing him from the

5    IWQ after the verbal altercation with Davis is without merit.  There is no basis for finding that a

6    reasonable housing deputy would have appreciated a high degree of risk to Jack, thereby making

7    the consequences of failing to remove Jack from IWQ obvious.  Pearson did not hear yelling, did

8    not hear a physical altercation, asked if the argument was squashed, was tolled by Jack, Davis, and

9    other inmates that the argument was squashed, neither Jack nor Davis looked angry, mattresses

10   were on both Jack's and Davis's bunks, and the inmates dispersed.  Pearson argues that he had no

11   information that Jack was aggressive or assaultive.  The circumstances of the verbal altercation

12   were not such that Jack faced a high degree of risk by remaining in the IWQ and that a physical

13   fight and injury to Jack was an obvious consequence.  Alternatively, Pearson argues that the

14   circumstances in this case entitle him to qualified immunity since a reasonable officer would not

15   know that Pearson's conduct violated clearly established federal law.

16   *Plaintiff's Opposition*

17   Jack argues that the Court's Rule 12(b)(6) orders show that a reasonable fact finder could

18   conclude that Pearson breached his Fourteenth Amendment duty to protect Jack from a fellow

19   inmate.  Every fact that the Court relied on in the motions to dismiss has evidentiary support.  The

20   deposition testimony of the two Ceres police officers show that Jack was in a foul mood and that

21   he might start a physical fight.  Pearson himself referred to Jack as an "a-hole," which suggests

22   that he thought that Jack's behavior was troubling and that Pearson may have intended to leave

23   Jack open to harm instead of keeping him safe.  Pearson also admitted that he heard arguing and

24   that the argument quieted down once Jack and Davis saw Pearson approaching, which suggests

25   that the dispute continued up until Pearson's arrival and thus, could not have been resolved.

26   Discovery has confirmed that Pearson likely could have prevented life altering injuries to Jack if

27   Pearson had simply remained at his post until Jack and Davis got back into their bunks and settled

28   down.  Instead, Pearson left the IWQ entirely and the fight ensued.

Jack also argues that qualified immunity is not appropriate in this case. Since 1994 it has been clear that guards owe a constitutional duty to protect pre-trial detainees from harm by others. The facts of this case are sufficiently obvious that a reasonable guard in Pearson's position would know that Pearson's actions violated the Fourteenth Amendment duty to protect.

*Prior 12(b)(6) Ruling*

On September 15, 2017, the Court issued the following ruling as part of Pearson's first Rule 12(b)(6) motion to dismiss:

> . . . Jack contends that Pearson failed to protect him from another prisoner/detainee. Viewing the Complaint's allegations as true and in the light most favorable to Jack, . . . Pearson was aware that Jack was in a combative mood and had not been provided a mattress. Pearson was aware that Jack was arguing with a fellow prisoner over a mattress at 3:30 a.m. and the other prisoner significantly outweighed Jack. Although Pearson spoke briefly to Jack and the inmate, Pearson allegedly left the area, and then Jack was immediately attacked. By allegedly leaving the area unattended by an accessible guard, Pearson created an opportunity for the attack to occur and violated 15 C.C.R. § 1027. Pearson also somehow failed to properly perform visual observation safety checks in violation of 15 C.C.R. § 1006 and § 1027.5. Moreover, the allegation that the attack occurred just after Pearson left the area inferentially indicates that the argument or confrontation was serious and had not been diffused.
>
> The above facts indicate that Pearson was aware of a significant confrontation between Jack and another inmate who outweighed him by 130 lbs., yet Pearson did nothing but leave the area unattended and fail to diffuse the situation. A significant confrontation between a smaller combative prisoner and a much larger prisoner over a mattress at 3:30 a.m. would seem to represent an obvious risk to prisoner safety and prison order. Walking away from such a confrontation or otherwise failing to take additional steps to protect Jack or diffuse the situation could represent a reckless disregard to Jack's right to safety. Therefore, the allegations plausibly indicate that Pearson was deliberately indifferent to a substantial danger to Jack from a physical confrontation between Jack and the much larger prisoner when Pearson did not diffuse the situation and completely left the area. Cf. Castro, 833 F.3d at 1073. Dismissal of the Fourteenth Amendment claim against Pearson for failure to protect is inappropriate at this time.

Jack v. County of Stanislaus, 2017 U.S. Dist. LEXIS 150367, *13-*14 (E.D. Cal. Sept. 15, 2017) (footnotes omitted).

*Legal Standard*

Pre-trial detainees possess personal security interests that are protected by the Fourteenth Amendment. See Castro v. County of L.A., 833 F.3d 1060, 1069-71 (9th Cir. 2016) (en banc); Redman v. County of San Diego, 942 F.2d 1435, 1443 (9th Cir. 1991) (en banc). In order to recover for injuries suffered while in custody, a pre-trial detainee "must show that the prison

official acted with 'deliberate indifference.'" Castro, 833 F.3d at 1067-68; Redman, 942 F.2d at 1443. The elements of a Fourteenth Amendment failure to protect claim are: "(1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) Those conditions put the plaintiff at substantial risk of suffering serious harm; (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (4) By not taking such measures, the defendant caused the plaintiff's injuries." Castro, 833 F.3d at 1071. "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn on the facts and circumstances of each particular case.'" Id. (quoting Kingsley v. Hendrickson, 135 S.Ct. 2466, 2473 (2015)). The third element is "more than negligence but less than subjective intent -- something akin to reckless disregard." Id.

### *Discussion*

1.      Non-Failure to Protect Federal Claims

The Third Amended Complaint contains causes of action under 42 U.S.C. § 1983 for violations of the Fourteenth Amendment. See Doc. No. 41 at 11:6-12:18. The Fourteenth Amendment claims are not limited to failure to protect, but also includes claims such as failure to protect, including failure to properly monitor and failure to provide medical care. See id. Jack's opposition explains that he is only pursuing one § 1983 claim and that it is for a failure to protect. See Doc. No. 57 at 1:4-14. "What is contested in this case is whether defendant Pearson breached his duty under both the Fourteenth Amendment and state law to protect Mr. Jack from harm at the hands of a fellow prisoner . . . ." Id. at 5:13-14. Given this representation which is in essence an express non-opposition, the Court will grant summary judgment on all § 1983 claims against Pearson except for the one claim based on Pearson's failure to protect Jack from harm by inmate Davis.

2.      Fourteenth Amendment Failure to Protect

a.      Constitutional Violation

The Court cannot conclude that the undisputed facts sufficiently support a conclusion that

Pearson acted in reckless disregard to a high degree risk of injury to Jack, such that injury at the hands of Davis was the obvious result. See Castro, 883 F.3d at 1071.

Pearson was unaware of Jack's behavior towards the Ceres police officers, and he was unaware of Officer Vega's earlier assessment that Jack could be physically resistant. Pearson's assessment of and interactions with Jack appear to be limited to escorting Jack to the IWQ and addressing the verbal altercation with Davis. During the escort over to the IWQ, Jack acted arrogant, rolled his eyes, appeared to be an "a-hole," but nevertheless followed Pearson's instructions and did not appear to cause Pearson any problems. When Pearson opened his office door after hearing raised voices and an argument, Pearson heard the raised voices and observed Jack walking towards his bunk. Although it is reasonably inferred that Davis and Jack continued to argue until they saw Pearson, the fact that Jack was walking towards his own bunk is indicative of de-escalation. When Pearson confronted the now silent Jack and Davis, he asked them both if the dispute was over, and they separately told him the dispute was done. Pearson then asked other inmates if the dispute was over, and other inmates confirmed that the dispute was done. Pearson knew that the dispute had something to do with a mattress on the wrong bunk, but when Pearson looked, both Davis and Jack had mattresses on their bunks. Thus, the subject of the disagreement appeared to have resolved. Pearson did not observe any non-verbal signs that either Jack or Davis were combative or aggressive, and Pearson was unaware of a history of recent or combative behavior from either Jack or Davis. Thus, the evidence indicates that Pearson heard a verbal altercation, saw Jack walking towards his bunk, was told by multiple inmates (including Jack and Davis) that a verbal altercation about a mattress was over and the issue "squashed," both Jack and Davis had mattresses, neither had a known history of combativeness, neither looked aggressive, and it was 3:30 a.m. (a typical time for sleep). Under these circumstances, Pearson did not act with a reckless disregard towards Jack. A high degree of risk of physical injury to Jack by Davis is not apparent such that it was obvious that Jack would suffer harm at the hands of Davis if Pearson did not take steps to protect Jack. Without a high degree of risk and an obvious result from not doing something to protect Jack, Pearson did not act with reckless disregard; the evidence does not support a Fourteenth Amendment claim. See Castro, 883 F.3d at 1071.

Jack has pointed to Frederick's testimony as supporting his claim. Frederick has indicated that inmates always tell guards that a dispute is over. It is possible that this point is well known among both guards and prisoners. However, there is no evidence that Pearson knew this or that this was consistent with Pearson's own experiences. Without evidence that Pearson was aware that Frederick's statement was true or that Pearson was aware that inmates often lie about a disagreement being resolved, Frederick's statement has limited probative value. At best, it perhaps suggests that the disagreement between Jack and Davis may not have been fully resolved, despite the inmates' statements and Jack and Davis both having mattresses. However, the Court cannot find that Frederick's information so undercuts the other undisputed facts and so raises the degree of danger that it was obvious that Jack would be injured by Davis from Pearson taking no further action.

Jack has raised legitimate points regarding Pearson's behavior. Pearson's investigation of the matter seems truncated at best since he did not attempt to get any specifics regarding the nature of the dispute or how it started. Pearson simply asked if the dispute was done. It would have certainly been reasonable to at least attempt to ferret out more details in order to determine if the dispute was really over. Further, Pearson immediately left the IWQ. It would certainly have been reasonable for Pearson to mingle around the second level of the IWQ, or stay in his office longer, or make sure that everyone went back to their bunks to sleep (since it was 3:30 a.m.), particularly since there had just been a verbal altercation. It was possible that the dispute was not actually over. However, these criticisms are all directed towards what a reasonable guard in the situation may have done and are supportive of a negligence theory. The issue for this cause of action, however, is not whether Pearson was negligent or breached a duty of care by merely failing to do something that a reasonable guard would have done. The issue is whether Pearson disregarded such a high degree of risk that it was obvious that Jack would be injured by Davis, i.e. whether Pearson acted with something akin to a reckless disregard of Jack's safety. These additional facts do not change the situation when Pearson left. Even considering the timing of Pearson's exit of the IWQ and Pearson's limited investigation, when Pearson left, he did so after having heard a verbal altercation, seen Jack walking towards his bunk, being told by multiple inmates (including

Jack and Davis) that a verbal altercation about a mattress was over and the issue "squashed," seeing that both Jack and Davis had mattresses, observing that neither Jack nor Davis looked aggressive, and having no knowledge that either Jack or Davis had a history of combativeness or aggressiveness.

Jack has pointed out that the testimony of the Ceres police officers shows that he had a combative attitude, and that because Pearson thought that Jack was an "a-hole," Pearson may have been aware of that combativeness. However, Pearson has affirmatively declared that he had no information from the Ceres police officers and was unaware of any of the circumstances surrounding Jack's arrest. No evidence disputes this assertion. Further, that Pearson thought that Jack was arrogant and an "a-hole" does not show a knowledge of combativeness or aggressiveness. These descriptions go to attitude and can clearly indicate an unpleasant individual. But there is nothing about arrogance, or being a jerk or an "a-hole," that inherently suggests aggressiveness or a disposition towards violence. Prior to Pearson having any interactions with Jack, Jack went through a screening procedure conducted by Officer Delgadillo. Based on the screening procedures, including an interview, Officer Mauldin determined Jack was safe to be housed in the IWQ. There is no evidence that either Delgadillo or Mauldin believed that Jack was aggressive, combative, or in danger of becoming so and thus, should not be around other inmates. Further, when Pearson did interact with Jack, it is undisputed that Jack followed the instructions that Pearson gave and did not appear to cause a problem. Given the nature of Pearson's description of Jack, Jack's willingness to follow instruction, and the independent classification decisions/evaluations of Delgadillo and Mauldin, and no indication that Pearson was aware of Jack's behavior with the Ceres officers, Pearson's description of Jack as an "a-hole" does not reasonably indicate that Pearson viewed Jack as combative or aggressive or intended him harm.

Finally, Jack correctly points out that this Court denied Rule 12(b)(6) motions to dismiss his Fourteenth Amendment failure to protect claim. However, the review of a Rule 12(b)(6) motion is different from the review of a Rule 56(a) motion. In a Rule 12(b)(6) motion, the Court accepts the factual allegations as true and makes all reasonable inferences in the plaintiff's favor.

In his complaints, Jack made allegations that it was known that he was combative, Pearson only briefly spoke to the inmates, Pearson left without diffusing the situation, and Jack was immediately harmed by the larger Davis. See Jack, 2017 U.S. Dist. LEXIS 150367 at *3-*14; Doc. Nos. 1, 18. The Court stands by its original analysis that the *allegations* that Jack made were sufficient to state a claim under the Rule 12(b)(6) framework. However, in the context of a Rule 56 motion, the key is the evidence actually presented to the Court, not the allegations made in the complaint. See Estate of Tucker, 515 F.3d at 1030. Here, the evidence shows a number of key facts that the allegations in the complaints did not: Pearson was not aware that Jack was combative; Jack was walking away (but still arguing) when Pearson stepped out of his office; Jack, Davis, and other inmates all agreed that there was no longer a problem; and before Pearson left, Jack and Davis both had a mattress. Because these facts were not part of any complaint, the Court's prior rulings on Rule 12(b)(6) motions are not dispositive.

In sum, the evidence is insufficient for a reasonable trier of fact to conclude that Pearson faced a high degree of risk to Jack by Davis and that Pearson's failure to take additional steps to protect Pearson led to an obvious result, injury to Jack by Davis. Therefore, summary judgment in favor of Pearson on the Fourteenth Amendment failure to protect claim is appropriate.

### b. Qualified Immunity

Qualified immunity applies when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. White v. Pauly, 137 S. Ct. 548, 551 (2017). Officers are entitled to qualified immunity under § 1983 unless (1) the officers violate a federal a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time." District of Columbia v. Wesby, 138 S.Ct. 577, 589 (2018); White, 137 S.Ct. at 551. "Clearly established" means that the statutory or constitutional question was "beyond debate," such that every reasonable official would understand that what he is doing is unlawful. See Wesby, 138 S.Ct. at 589; Vos v. City of Newport Beach, 892 F.3d 1024, 1035 (9th Cir. 2018). This is a "demanding standard" that protects "all but the plainly incompetent or those who knowingly violate the law." Wesby, 138 S.Ct. at 589 (citing Malley v. Briggs, 475 U.S. 335, 341 (1986)). To be "clearly established," a rule must be dictated

by controlling authority or by a robust consensus of cases of persuasive authority.  Id.; see also

Perez v. City of Roseville, 882 F.3d 843, 856-57 (9th Cir. 2018) (noting that Ninth Circuit

precedent is sufficient to meet the "clearly established" prong of qualified immunity).  In

examining whether a rule/right is clearly established, courts are to define the law to a "high degree

of specificity," and not "at a high level of generality."  Wesby, 138 S.Ct. at 590.  The key question

is "whether the violative nature of particular conduct is clearly established" in the specific context

of the case.  Vos, 892 F.3d at 1035 (quoting Mullenix v. Luna, 136 S.Ct. 305, 308 (2015)).

Although it is not necessary to identify a case that it is "directly on point," generally the plaintiff

needs to identify where an officer acting under similar circumstances was held to have violated

federal right.  Wesby, 138 U.S. at 577; Vos, 892 F.3d at 1035; Felarca v. Birgeneau, 891 F.3d 809,

822 (9th Cir. 2018); Shafer v. City of Santa Barbara, 868 F.3d 1110, 1118 (9th Cir. 2017).

Whether a constitutional right was violated is generally a question of fact for the jury, while

whether a right was clearly established is a question of law for the judge.  Morales v. Fry, 873

F.3d 817, 823 (9th Cir. 2017).

　　　　Here, as discussed above, Pearson did not act in reckless disregard to high degree of risk.

Nevertheless, in the alternative, if the facts are viewed as showing a constitutional violation, then

qualified immunity is appropriate.  Jack has identified no cases in which similar to the facts of this

case.  As discussed above, the evidence indicates that Pearson heard a verbal altercation, saw Jack

walking towards his bunk, was told by multiple inmates (including Jack and Davis) that a verbal

altercation about a mattress was over and the issue "squashed," both Jack and Davis had

mattresses, neither had a known history of combativeness, neither looked aggressive, and it was

3:30 a.m. (a typical time for sleep).  In other words, there were signs of de-escalation and the

subject of the dispute appeared to be addressed because Jack had a mattress.  It is Jack's burden to

identify such cases.  See Vos, 892 F.3d at 1035; Felarca, 891 F.3d at 822; Shafer, 858 F.3d at

1117-18.  Jack has cited only cases that have established the general right of prisoners and pre-trial

detainees to be protected.  This amounts to an attempt to define the right at issue in a high degree

of generality, which is insufficient.  See Wesby, 138 S.Ct. at 590.  Further, the Court cannot hold

that the facts of this case makes it one of the "rare" instances where the constitutional violation is

so obvious that no case that is closely on point is necessary.  See id. at 591.  In the absence of cases that are similar to the facts in this case, Pearson is entitled to qualified immunity because Jack's right to be protected from harm by Davis under the circumstances of this case was not "clearly established."  See id. at 589-90; White, 137 S.Ct. at 551; Vos, 892 F.3d at 1035; Felarca, 891 F.3d at 822; Shafer, 858 F.3d at 1117-18.

### 3.    Negligence Claims

In prior motions to dismiss, the Court recognized that California recognizes a duty of a jailer to protect prisoners.  See Jack v. Stanislaus County, 2018 U.S. Dist. LEXIS 54387, *10 (E.D. Cal. Mar. 30, 2018).  The Court permitted Jack to pursue a negligent failure to protect claim since he had alleged a viable Fourteenth Amendment failure to protect claim and the standards for a Fourteenth Amendment claim are more stringent than for a state law negligence claim.  See id. As discussed above, the Court has granted summary judgement to Pearson on the Fourteenth Amendment failure to protect claim because the undisputed evidence does not sufficiently show that Pearson acted with a reckless disregard to an obvious risk of danger to Jack, and alternatively, qualified immunity is appropriate.  A "reckless disregard" is a higher standard than negligence. See Castro, 833 F.3d at 1071; Delaney v. Baker, 20 Cal.4th 23, 31 (1999); Cochrum v. Cost Victoria Healthcare, LLC, 25 Cal.App.5th 1034, 1045 (2018).  Therefore, that Pearson's conduct did not rise to the level of a "reckless disregard" of a "high degree of risk" does not mean that Jack's negligence claim must fail as well.  Similarly, that a reasonable guard in Pearson's position would not know that  Pearson's conduct under the circumstances violated established federal law does not mean that Pearson was not negligent under California law.  Therefore, the Court's resolution of the Fourteenth Amendment failure to protect claim does not dictate the same result with respect to Jack's negligent failure to protect claim.

That being said, summary judgment has now been granted on all of federal claims in this case.  Given Jack's non-opposition, state law negligence claims are all that remain.  Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise jurisdiction over supplemental state law claims if "the district court has dismissed all claims over which it has original jurisdiction." The general rule is "when federal claims are dismissed before trial . . . pendent state claims should

also be dismissed." Religious Tech. Ctr v. Wollersheim, 971 F.2d 364, 367-68 (9th Cir. 1992);

Schultz v. Sundberg, 759 F.2d 714, 718 (9th Cir. 1985). Considering judicial economy,

convenience, fairness, and comity, and because summary judgment has been granted on all of

Jack's federal claims, the Court will decline to exercise supplemental jurisdiction over the

remaining state claims.[8] See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988); City

of Colton v. American Promotional Events, Inc.-West, 614 F.3d 998, 1008 (9th Cir. 2010)

("Because the district court did not err in granting summary judgment on the federal claims, it did

not abuse its discretion in dismissing the state-law claims."); Religious Tech., 971 F.2d at 367-68;

Neylon v. Inyo County, 2018 U.S. Dist. LEXIS 130979, *56-*57 (E.D. Cal. Aug. 3, 2018).


**ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1.  Defendant's motion for summary judgment with respect to all of Plaintiff's 42 U.S.C. §
    1983 claims is GRANTED;

2.  Pursuant to 28 U.S.C. § 1367(c)(3), the Court DECLINES to exercise supplemental
    jurisdiction over Jack's state law negligence claims;

3.  All currently set dates and deadlines are VACATED; and

4.  The Clerk is directed to CLOSE this case.


IT IS SO ORDERED.

Dated:   January 13, 2020     _____

                              SENIOR  DISTRICT  JUDGE

---

[8] The Court particularly notes its concerns over comity.  Jack's failure to protect negligence claim relies in part on alleged violations of a state prison regulation and the negligence *per se* doctrine.  Jack also emphasizes tensions between Stanislaus County jail policies and the state regulation.  The state regulation that Jack relies on, 15 C.C.R. § 1027, has been cited rarely.  The Court is aware of no published state court cases that either meaningfully interpret these regulations or apply them as part of the negligence *per se* doctrine.  Under these circumstances, and in the absence of any further federal claims, it is more desirable for California courts to interpret California regulations and county jail policies in relation to Jack's California law negligence claims.